Bill MERCER, Plaintiff-Appellee,

v.

LONG MFG. N.C., INC.,
Defendant-Appellant.

No. 79–2346.

United States Court of Appeals,
Fifth Circuit.*
Unit A

Jan. 4, 1982.

* Former Fifth Circuit case, Section 9(1) of Public    Law 96–452—October 14, 1980.

Clyde E. Bracken, Philip R. Russ, Dallas, Tex., for defendant-appellant.

Sheehy, Lovelace & Mayfield, Philip E. McCleery, Waco, Tex., for plaintiff-appellee.

Before BROWN, COLEMAN and GEE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

In this appeal, Long Manufacturing (Long), the manufacturer of a peanut combine, challenges the judgment entered against it as being based on inconsistent answers to special interrogatories under F.R.Civ.P. 49(a). The case was submitted to the jury by general charge with four special interrogatories, one for each of the three theories of liability—(i) breach of warranty, (ii) violation of the Texas Deceptive Trade Practices—Consumer Protection Act (DTPA)[1], and (iii) strict liability—and

---

1. The DTPA as enacted in 1973 provided as follows:

one for the amount of damages. Long also challenges the damage instruction given with respect to strict liability. Finding that the answers to two of these special interrogatories—those dealing with the breach of warranty and with deceptive practices—cannot be reconciled, we reverse and remand for a new trial. We sustain the jury's finding as to strict liability but reverse for a new trial, concluding that the charge on damages pertaining to that claim was erroneous.

### Nuts and Bolts

In November 1974, Plaintiff Bill Mercer, a part-time peanut farmer, purchased a new Super II peanut combine[2], manufactured by Long, from Hood County Equipment Company (Hood). The combine came with a 90-day warranty from Long. Apparently the first combine delivered to Mercer malfunctioned and a second combine, the one at issue in this case, was substituted. After continual operational problems and malfunctions with the combine, Mercer returned the machine to the dealer at the end of the first season for modification by Long. The combine remained with the dealer for several months during which time only minimal repairs or changes were made. These modifications apparently did not alleviate the problems with the combine, and Mercer continued to have difficulty with the machine. Eventually Hood, the dealer, indicated that it was unable to undertake any more repairs and that Mercer would have to deal with Long directly. Mercer continued to use the combine, repairing it himself, in order to harvest his crops. Throughout the period of use, from 1974 through 1978, Mercer demanded that Long fix the machine, replace the machine, or compensate him for it. Because of the continual operational problems, Mercer suffered damage to his peanut crop. This damage resulted both from delays ("down time") during which period the machine was not operational and the crop deteriorated and from the actual operation of the combine which dropped peanuts on the ground after combining.

In June 1976, Mercer filed suit in Texas state court against Long, which suit was removed by Long to federal court. Mercer alleged that the combine was defective in design and manufacture and was neither merchantable nor fit for the purposes for which it was intended. The basis for liability was threefold: (i) breach of implied warranty of merchantability or fitness[3]; (ii) violation of the DTPA[4]; and (iii) defective

---

Sec. 17.50. Relief for Consumers
(a) A consumer may maintain an action if he has been adversely affected by any of the following:
(1) the use or employment by any person of an act or practice declared to be unlawful by Section 17.46 of this subchapter;
(2) a failure by any person to comply with an express or implied warranty;
(3) any unconscionable action or course of action by any person; or
(4) the use or employment by any person of an act or practice in violation of Article 21.21, Texas Insurance Code, as amended, or rules or regulations issued by the State Board of Insurance under Article 21.21, Texas Insurance Code, as amended.
1973 Tex.Gen.Laws, ch. 143, § 1, at 326–27.
The 1977 Amendments changed Section 17.-50(a)(2) to read as follows:
(a) A consumer may maintain an action if he has been adversely affected by any of the following:
. . . .
(2) breach of an express or implied warranty;
1977 Tex.Gen.Laws, ch. 216, § 5, at 603.

**2.** As of April 1, 1977, Long manufactured 1100 Super II combines, 880 of which were sold and 679 of which were the subject of some type of warranty claim.

**3.** *See* Tex. Bus. & Com. Code Ann. §§ 2.314, 2.315 (Tex. U.C.C.) (Vernon 1968).

**4.** Mercer alleged the following violations of the DTPA:
In connection with the manufacture and sale of the peanut combine in question, Defendant has violated the Deceptive Trade Practices—Consumer Protection Act. In this regard, Defendant has committed false, misleading, or deceptive acts or practices in the conduct of its trade or commerce as more specifically set out below:
(a) Defendant represented that the peanut combine had characteristics, uses and benefits which it did not have;
(b) Defendant knowingly made false or misleading statements of fact concerning the need for parts, replacement or repair service;
(c) Defendant failed to provide a proper operating and instructions manual;

design and manufacture of the combine rendering the machine unreasonably dangerous to the property of Mercer under a theory of strict liability in tort [5]. Recovery was sought for: (i) the difference in value between the machine as warranted and as received; (ii) costs of interim repairs to the machine; and (iii) damage to crops [6]. The crop damage included three elements: deterioration of the crop during the time the machine was not functioning; loss of marketable hay which is also produced during the harvesting; and loss of a portion of the peanut crop which resulted from the combine's dropping peanuts on the ground and splitting the shells.[7] Long denied the existence of any express or implied warranties, denied that the combine was defective in design, and alleged that Mercer's misuse of

the peanut combine constituted the sole producing and proximate cause of the damages. The case was submitted to a jury in the form of a general charge with special verdict consisting of four interrogatories under F.R.Civ.P. 49(a).[8] In response to these interrogatories, the jury found: (i) for Mercer as to a breach of warranty; (ii) for Long as to violation of the DTPA; (iii) for Mercer as to the theory of strict liability; and (iv) damages to Mercer in the amount of $17,000.

Long filed a motion for j. n. o. v. and in the alternative a motion for new trial, which motion was denied. The District Court, finding that the breach of a warranty claim was a per se violation of the DTPA, which act provides for treble damages,[9] entered judgment for Mercer in the

(d) The Defendant made outright false statements and misrepresentations concerning the need for the repair and modification of the machine, their willingness to make modifications and repairs and the fact that they did make modifications and repairs;

(e) Defendant committed acts or practices in connection with the manufacture and sale of the peanut combine which were false, misleading and deceptive;

(f) Defendant, in the manufacture and sale of the peanut combine breached both express and implied warranties. All of the above listed acts, practices or statements are unconscionable. All of the above were either false, misleading or deceptive or all three and all constituted violations of the Deceptive Trade Practices—Consumer Protection Act.

**5.** *See* note 15 *infra.*

**6.** *See* note 18 *infra.*

**7.** The elements (i) and (ii) are economic loss, recoverable if at all under the U.C.C. for breach of warranty and consequential losses. Element (iii) is that which would form the basis of strict liability, damage to "other property."

**8.**                    VERDICT

We, the Jury, find as follows:

AS TO BREACH OF WARRANTY:

We, the Jury, find for the Plaintiff, Bill Mercer __Yes__ .

We, the Jury, find for the Defendant, Long Mfg. N.C., Inc. ____.

AS TO DECEPTIVE TRADE PRACTICES:

We, the Jury, find for the Plaintiff, Bill Mercer ____.

We, the Jury, find for the Defendant, Long Mfg. N.C., Inc. __Yes__ .

AS TO STRICT LIABILITY:

We, the Jury, find for the Plaintiff, Bill Mercer __Yes__ .

We, the Jury, find for the Defendant, Long Mfg. N.C., Inc. ____.

(Answer the following only if you found for Plaintiff on one of the above.)

AS TO DAMAGES:

We, the Jury, assess damages for Plaintiff, Bill Mercer against Defendant, Long Mfg., N.C., Inc. in the amount of __$17,000__ .

**9.** Section 17.50(b) of the 1973 DTPA provided for the following remedies:

(b) In a suit filed under this section [§ 17.50(a)], each consumer who prevails may obtain:

(1) three times the amount of actual damages plus court costs and attorneys' fees reasonable in relation to the amount of work expended;

(2) an order enjoining such acts or failure to act;

(3) orders necessary to restore to any party to the suit any money or property, real or personal, which may have been acquired in violation of this subchapter; and

(4) any other relief which the court deems proper, including the appointment of a receiver or the revocation of a license or certificate authorizing a person to engage in business in this state if the judgment has not been satisfied within three months of the date of the final judgment. The court may not revoke or suspend a license to do business in this state or appoint a receiver to take over the affairs of a person who has failed to satisfy a judgment if the person is a licensee of or regulated by a state agency which has statutory authority to revoke or suspend a license or to appoint a receiver or trustee.

sum of $51,000, plus attorney's fees and costs. After denial of its amended motion for new trial, Long filed this appeal attacking the jury verdict as being inconsistent, the trial court's damage instructions as to strict liability as being incorrect, and the DTPA, as in effect at the time, as unconstitutional unless proof of scienter is required to establish a claim for treble damages for breach of warranty.[10]

### Mixed Nuts: Reconciling the Inconsistencies

Long's primary argument is that the jury's answers to special interrogatories are inconsistent and cannot be reconciled. Mercer asserts that the verdict is not governed by F.R.Civ.P. 49(a), but that this case was submitted on a general charge with three separate general verdicts, one for each of three separate theories of liability. Although the interrogatories included three bases for liability, we find that the submission was pursuant to F.R.Civ.P. 49(a). No general verdict was rendered by the jury, and the District Court entered judgment only after applying the treble damage provisions of the DTPA, both factors pointing against finding a submission under F.R. Civ.P. 49(b).

The test for determining whether jury answers to special verdicts are inconsistent is well-established in this Circuit.

This court has stated that the test to be applied in reconciling apparent conflicts between the jury's answers is whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted, even though the form of the issue or alternative selective answers prescribed by the

1973 Tex.Gen.Laws, ch. 143, § 1, at 322. The Texas Supreme Court has interpreted § 17.-50(b)(1) as mandatory in requiring treble damages once liability is established under § 17.-50(a). *Woods v. Littleton,* 554 S.W.2d 662 (Tex.1977).

**10.** In a supplemental letter brief of December 12, 1980, Long abandoned its attack on the constitutionality of the DTPA. The basis for Long's action was its discovery, just subsequent to oral argument before this Court, that

judge may have been the likely cause of the difficulty and largely produced the apparent conflict.... If on review of the District Court's judgment we find that there is no view of the case which makes the jury's answers consistent and that the inconsistency is such that the special verdict will support neither the judgment entered below nor any other judgment, then the judgment must be reversed and the cause remanded for trial anew.

*Griffin v. Matherne,* 471 F.2d 911, 915 (5th Cir. 1973) (citations omitted). *See also Gallimore v. Missouri Pacific Railroad Co.,* 635 F.2d 1165 (5th Cir. 1981); *Dallas-Fort Worth Regional Airport Board v. Combustion Equipment Associates, Inc.,* 623 F.2d 1032 (5th Cir. 1980); *Guidry v. Kem Manufacturing Co.,* 598 F.2d 402 (5th Cir. 1979), *cert. denied,* 445 U.S. 929, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980); *Willard v. The John Hayward,* 577 F.2d 1009 (5th Cir. 1978).

We are required under the Seventh Amendment to make a concerted effort to reconcile apparent inconsistencies if at all possible. *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798, 806–07 (1962); *Miller v. Royal Netherlands Steamship Co.,* 508 F.2d 1103, 1106–07 (5th Cir. 1975); *Griffin v. Matherne, supra.* "We therefore must attempt to reconcile the jury's findings, by exegesis, if necessary ... before we are free to disregard the jury's verdict and remand the case for a new trial." *Gallick v. B & O R.R. Co.,* 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618, 627 (1963). *See Morrison v. Frito-Lay, Inc.,* 546 F.2d 154 (5th Cir. 1977); *Gonzales v. Missouri Pacific Railroad Co.,* 511 F.2d 629 (5th Cir. 1975); *R.B. Co. v. Aetna Insur-*

the 1973 version of the DTPA proscribed "a failure by any person to comply with an express or implied warranty", as opposed to the 1977 version of the Act, applied by the District Court, which proscribed "breach of an express or implied warranty." Long's position is that a "failure to comply" inherently requires scienter. For the reasons discussed later in this opinion, we do not accept Long's interpretation of "failure to comply" and therefore address the constitutionality of the statute.

*ance Co.,* 299 F.2d 753 (5th Cir. 1962). In attempting to reconcile special verdicts, we must also look to the court's instructions. *Griffin, supra; McVey v. Phillips Petroleum Co.,* 288 F.2d 53, 59 (5th Cir. 1961).

■ With our constitutional mandate to create consistency where possible, we focus on the actual conflicts between the answers to the interrogatories here. On the surface, there appears to be no conflict between the finding of a breach of warranty and no violation of the DTPA. Under interrogatory (1) the jury found a breach of warranty in that the combine was not fit for the ordinary purposes for which it was sold.[11] The conflict appears when we look to the actual instructions in the jury charge of the District Court concerning the claimed violations of the DTPA, the subject of interrogatory (2). The District Court specifically charged that, along with certain misrepresentations and misleading statements, a breach of an express or implied warranty was a violation of the Act.[12] This instruction is in accordance with the statute, as amended in 1977, which provides that "a

consumer may maintain an action if he has been adversely affected by . . . (2) breach of an express or implied warranty. . . ." 1977 Tex.Gen.Laws, ch. 216, § 5, at 603.

In the light of the court's charge and the answer of the jury to interrogatory (2) it is impossible for this Court to exclude the possibility that the jury found that Long did not breach an express or implied warranty. The possibility is so great as to create a direct conflict with the explicit determination in interrogatory (1) that a breach of warranty had occurred. For this reason, the case must be remanded for trial again on the issues of breach of warranty and violation of the DTPA and resulting damages, if any.

■ Long also asserts that the answer to interrogatory (3) which deals with strict liability is inconsistent with the answer to interrogatory (2) and thus none of the jury's findings can be upheld. To create a conflict between interrogatories (2) and (3), Long begins with the District Court's instructions on the issue of strict liability[13]

11. You are instructed that a warranty of merchantability was implied in the sale of the peanut combine by the Defendant. The Defendant in effect warranted that the combine was fit for the ordinary purposes for which it was sold. If you the jury find from a preponderance of the evidence that the combine was not fit for the ordinary purposes for which it was sold, you will find for the Plaintiff, Bill Mercer. Otherwise you will find for the Defendant, Long Manufacturing, on the breach of warranty claim.

12. The Texas Deceptive Trade Practices—Consumer Protection Act makes unlawful false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. The Act sets out a list of certain acts or practices that are considered a violation of the Act. The Plaintiff here alleges that the Defendant violated the Act in that 1) the Defendant breached an express or implied warranty, 2) the Defendant represented that the combine had characteristics, uses, or benefits that it did not have, 3) the Defendant knowingly made false or misleading statements of fact concerning the need for parts, replacement, or repair service for the combine, and 4) the Defendant represented that work or services had been performed on, or parts replaced in the combine, when such action had not been taken.

For the purpose of this action an express warranty is any affirmation, be it written or

oral, of fact or promise relating to the product, that is made by the seller to the buyer. The implied warranty of merchantability has been explained previously.

If you the jury find from a preponderance of the evidence that the Defendant has committed one or more of the above alleged acts, you will find for the Plaintiff, Mr. Mercer; otherwise you will find for the Defendant.

13. Finally the Plaintiff alleges that the Defendant is liable under the doctrine of strict liability. To recover under this doctrine, the Plaintiff need prove by a preponderance of the evidence three elements. First, the Plaintiff need prove that the combine manufactured by the Defendant was unreasonably dangerous to the property of the Plaintiff due to defective design or manufacture. Secondly, the Plaintiff must prove that the combine was intended to, and did reach the ultimate consumer, Mr. Mercer, without substantial change from the condition in which it left the manufacturer. Finally, the Plaintiff must show the defective design or manufacture of the combine was a producing cause of damage to the Plaintiff.

Now I will explain to you the meaning of some of these terms. You have already been instructed on the meaning of the terms "preponderance of the evidence" and "producing cause." The term "defective condition" as used in this charge means a condition not con-

and focuses on the court's definition of a "defective" product.

Long reasons that implicit in the jury's determination that no violation of the DTPA had occurred (interrogatory (2)) was a finding that there was no breach of an implied warranty. Long then equates the finding of strict liability to that of breach of warranty which puts the answers to interrogatory (2) and interrogatory (3) in conflict.

We find this argument without merit, being based on a strained and incomplete reading of the charge on the issue of strict liability. The District Court specifically stated that "unfit for its intended use" for purposes of strict liability meant "a product sold in a defective condition, unreasonably dangerous to the consumer or user, and constituting the danger beyond that which would be contemplated by the ordinary user who purchased it with the ordinary knowledge common to the community as to the characteristics of the product." While the choice of the language "unfit for its intended use" might appear confusing when taken out of context, the judge here clearly defined this term with reference to defective design or manufacture creating an unreasonable danger.

Under the command of the Seventh Amendment we believe it is possible to reconcile interrogatories (2) and (3), since under the instructions given, considered as a whole, it was possible that the jury found that the combine, while fit for the ordinary purposes of combining peanuts, was defective in design or manufacture to such an extent that it was unreasonably dangerous to the peanut crop. Strict liability and warranty are two distinct bases of liability, and while there may be some overlap, the focus of strict liability is on the safety level of the product, not the performance level.

Because of the error in the court's submission on damages we are not, for reasons next discussed, able to affirm the judgment on this score.

### Losses: More than Just Peanuts

Long's contention is that even if interrogatories (2) and (3) are not in conflict, the finding for Mercer under the theory of strict liability (interrogatory (3)) cannot support an award of damages because the instruction as to the measure of damages was erroneous since economic loss—the difference in value in the machine as warranted and as received, the profits on the crops lost due to inability to harvest when the machine was not functioning, and the cost of interim repairs to the combine—is not compensable under a theory of strict liability. The instructions [14] given to guide the

---

templated by the ultimate consumer or user of the product which condition will be unreasonably dangerous to him when the product is used for its intended purpose. The term "unreasonably dangerous" as used in this charge means dangerous to an extent beyond that which is contemplated by the ordinary user of the product, assuming the ordinary user has ordinary knowledge common to the foreseeable class of users as to the product's characteristics.

A product is defective if it is "unfit for its intended use." By the term "unfit for its intended use" is meant a product sold in a defective condition, unreasonably dangerous to the consumer or user, and constituting the danger beyond that which would be contemplated by the ordinary user who purchased it with the ordinary knowledge common to the community as to the characteristics of the product.

It is possible for a product to be unreasonably dangerous even if the Defendant exercised all possible care in manufacturing and designing of the product. On the other hand, the

manufacturer is not required to produce a product incapable of producing damage.

If you find by a preponderance of the evidence that the Plaintiff has established the elements of strict liability, you will find for the Plaintiff, otherwise you will find for the Defendant.

14. Damages must be reasonable. If you should find that the Plaintiff is entitled to a verdict, you may award him only such damages as will reasonably compensate him for such injury and damage as you find, from a preponderance of the evidence in this case, that he sustained as a result of the occurrence in question.

In arriving at the amount you should consider the following amounts:

(a) the difference at the time and place of acceptance between the value of the combine accepted and the value it would have had if it had been as warranted;

(b) any injury to the property proximately resulting from the malfunction of the machine including lost profits due to loss of crops,

jury in fixing the single dollar figure for all damages included some elements which were strictly economic losses not recoverable under strict liability (see (a) and parts of (b)) and some recoverable under strict liability (see parts of (b)). Finding that the damage instruction was incorrect because it allowed the jury to include damages for economic loss contrary to Texas case law on strict liability, we must set aside the judgment on this third issue as well.

Texas courts adopted the language of Section 402A of the Restatement (Second) of Torts [15] in 1967 and have allowed recovery for personal injuries and property damage caused by unreasonably dangerous products. In *Two Rivers Co. v. Curtiss Breeding Service*, 624 F.2d 1242 (5th Cir. 1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 348 (1981), we analyzed the four types of property loss recognized in Texas and determined which of these allowed recovery for damages under strict liability, implied warranties of the Uniform Commercial Code, or both. We indicated that losses involving physical injury to the property itself if accompanied by damage to other property of the user were recoverable under section 402A. Conversely if no damage to other property of the user occurs, damage to the product itself is not recoverable under strict liability. All other types of losses are recoverable, if at all, as economic losses under the U.C.C. The Texas Supreme Court has adopted the following definition of economic loss:

Direct economic loss may be said to encompass damage based on insufficient product value; thus, direct economic loss may be "out of pocket"—the difference in value between what is given and received—or "loss of bargain"—the difference between the value of what is received and its value as represented. Direct economic loss also may be measured by cost of replacement and repair. Consequential economic loss includes all indirect loss, such as loss of profits resulting from inability to make use of the defective product.

*Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77, 78 n.1 (Tex.1977), *quoting* Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum.L.Rev. 917, 918 (1966).

The Texas courts have addressed the issue of recovery for both economic losses and physical injury to property in a trilogy of cases, *Nobility Homes, supra, Mid Continent Aircraft Corp. v. Curry County Spraying Services, Inc.*, 572 S.W.2d 308 (Tex.1978), and *Signal Oil and Gas Co. v. Universal Oil Products*, 572 S.W.2d 320 (Tex.1978). In *Nobility Homes*, an individual who had purchased a mobile home brought suit to recover damages for the economic loss (the difference between the purchase price of the mobile home and its reasonable market value) suffered as a result of defects due to negligent construction. The plaintiff there also alleged that the mobile home was not

measured as the difference between the reasonable market value of each crop as raised and sold and the reasonable market value of the crop which would have been produced and sold had the combine been as warranted;

(c) the reasonable and necessary amounts expended by Plaintiff Mercer in an attempt to place the peanut combine in proper operating condition.

If you find that damages have been sustained by Plaintiff Mercer, enter the amount so found, if any.

Mercer claimed that the combine, for which he paid $5,125.00, was worthless. He also alleged that he spent $3,800.00 for interim repairs. Crop damage amounted to $17,869.00.

**15.** (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to

liability for *physical harm thereby caused to the ultimate user or consumer, or to his property*, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A (1965) (emphasis added).

fit for the purposes for which it was sold. The Texas Supreme Court denied recovery under section 402A for this economic loss since there was no finding that the defects made the mobile home unreasonably dangerous or caused physical harm to the owner or his property. The court held that the plaintiff could recover economic loss in the form of the difference between purchase price and market value under implied warranties of the Uniform Commercial Code but not under strict liability. In Mercer's case, economic loss would consist of difference in value between the combine as warranted and as received, and also any lost profits on the crops resulting from his inability to use the combine for harvesting.

In *Mid Continent Aircraft*, the plaintiff sought to recover damages for physical injury to an airplane and for loss of the value of its use when it made a forced landing caused by negligent installation of a part. As opposed to *Nobility Homes*, here the defect caused physical harm to the product itself. The Texas Supreme Court, rejecting coverage of the loss under strict liability stated, "when no physical injury has occurred to persons or other property, injury to the defective product itself is an economic loss governed by the Uniform Commercial Code." *Mid Continent Aircraft*, 572 S.W.2d at 313. As we pointed out in *Two Rivers*, "the damage to the product is merely a loss to the purchaser of the benefit of the bargain with the seller." 624 F.2d at 1246.

The third case in the series, *Signal Oil and Gas Co. v. Universal Oil Products*, 572 S.W.2d 320 (Tex.1978), involved physical harm to both the product and other property of the plaintiff. In that case, a defective isomax reactor charge heater exploded causing a fire and destruction of not only the heater but also a significant portion of Signal Oil's refinery. The Texas Supreme Court held that:

> Where such collateral property damage exists in addition to damage to the product itself, recovery for such damages are recoverable under Section 402A of the Restatement (Second) of Torts as damage to property or under the Texas Business and Commerce Code, Section 2.715, as consequential damages for a breach of an implied warranty. To the extent that the product itself has become part of the accident risk or the tort by causing collateral property damage, it is properly considered as part of the property damages, rather than as economic loss.

*Signal Oil*, 572 S.W.2d at 325 (footnote omitted). The court quoted with approval the distinction made by Dean Keeton between a dangerous condition that causes damage only to the product itself and one that is dangerous to other property or persons, the latter being properly considered within the rubric of strict liability.[16]

In our summary of Texas law in *Two Rivers*, we concluded that while a plaintiff was precluded from recovering economic loss under strict liability, if both the product *and* other property were damaged, the plaintiff would have a cause of action under both strict liability and the U.C.C.

■ Long's primary contention is that Mercer's loss is economic and therefore governed by *Nobility Homes*. Long distinguishes *Signal Oil* from the instant case because, unlike Mercer's situation, *Signal Oil* involved an *accident*. The basis for this distinction is the Texas Supreme Court's statement that "[t]o the extent that the product itself has become part of the *accident risk or the tort* by causing collateral property damage, it is properly considered as part of the property damages, rather than as economic loss." 572 S.W.2d at 325 (footnote omitted) (emphasis added). We reject such a limited reading of *Signal Oil*, especially since in the following paragraph the Texas Supreme Court stated that "Signal has properly alleged a cause of action in strict liability based upon its allegations of property damages" without any reference to damages occurring within the context of an accident. Nor do we find any such requirement in section 402A of the Restatement (Second) of Torts. As we indicated in

---

**16.** *See* Keeton, *Annual Survey of Texas Law on*     *Torts*, 32 Sw.L.J. 1, 5 (1978).

*Two Rivers*, "strict liability in Texas has been defined to cover personal injuries and physical injuries to a consumer's other property caused by an *unreasonably dangerous* product." 624 F.2d at 1248.

■ As the charge demonstrates, the damage figures fixed allowed the jury to include those items which are not recoverable under strict liability and must be recovered under the U.C.C. The items that could properly be allowed under strict liability were mixed with those elements allowed solely under the U.C.C.

■ Long further argues that there is no evidence in the record concerning the amount of physical harm or damage to collateral property owned by Mercer and that the damages suffered by Mercer were related to physical harm to the product itself and consequential economic loss, largely consisting of profits lost from inability to use the machine for harvesting the peanut crop in time. In support of this position, Long relies on *Lockwood Corporation v. Spencer*, 613 S.W.2d 369 (Tex.Civ.App.—Amarillo 1981, writ ref'd n.r.e.). In *Lockwood*, a tenant farmer brought an action in strict liability for crop damage due to lack

17. The court of civil appeals stated:
As developed by pleadings and proof to judgment, [the plaintiff's] cause of action became one for the recovery of lost profits resulting from inability to make use of a defective product. *Nobility* holds that the loss of profits resulting from inability to make use of a defective product is a consequential economic loss, ... which may not be recovered under Section 402A of the Restatement (Second) of Torts, but may be recovered only under implied warranties of the Uniform Commercial Code and under the common law theory of negligence.... Since [the plaintiff's] monetary judgment for economic loss has no basis other than the inapplicable tort theory of strict liability, the judgment cannot stand.
613 S.W.2d at 370 (citations omitted). The court also indicated that it was unnecessary to consider whether the submission of the strict liability theory had been defective and if there was a lack of evidence to support the jury's awarding of damages.

18. This is illustrated by Mercer's answers to interrogatories, in which he gave the following breakdown of damages:

of irrigation caused by a defective irrigation system. The Amarillo Court of Civil Appeals, construing the crop damage as economic loss, denied recovery under strict liability and observed that the plaintiff's evidence of monetary damages was confined to the loss of corn production and "there is no *pleading* or *testimony* of any personal injury or other damage to property" (emphasis added).[17] *Lockwood* is not controlling in this case since Mercer both pleaded and offered testimony at trial concerning damages to his tractor and to the peanuts. The combine allegedly both split the shells of peanuts and discarded peanuts while combining. This type of damage to "other property" (the peanuts) is distinctly different from economic loss resulting from loss of value of the product or the inability to make use of the defective product—the type of damage consisting of lost profits from inability to harvest within the required time. While there may be some difficulty in apportioning "crop damage" between damage to other property (the peanuts) recoverable under strict liability and economic loss recoverable under breach of warranty, some evidence was produced of damage to other property.[18]

1975—
$3,200.00—crop loss—75% of 20 acres yield
1,200.00—hay loss

1976—
$6,569.00—crop loss—27.1 acres not harvested
900.00—hay loss

1977—
$6,000.00—crop loss—20% loss due to late harvest on 147.9 acres

1,722.75—available receipts for parts
195.00—Dilling
960.43—Magee (undetermined amount of this was for bulldozing work)
64.83—canceled checks
835.00—labor
$21,647.03 TOTAL

Illustrating the type of damage is Mercer's reponse to an interrogatory asking for a definition of "crop damage":
Peanuts are dug and put in a windrow where they are left to dry to a moisture content of approximately 16% for three (3) days. When the Super II peanut combine moves in to harvest peanuts, humidity must be approximately

On retrial, the court should construct the interrogatories and the general charge respecting them in a way that the identifiably separate elements or kinds of damages are clearly stated for jury determination so that the court can then allow in the judgment those items recoverable (according to controlling Texas principles) under one or more or all of the distinctive theories of strict liability, U.C.C., or otherwise depending on the jury's answers to separate interrogatories fixing liability.

### Planting for the Next Harvest

■ Since this case must be remanded for a new trial, we address some sticky issues likely to arise again. During oral argument, Long announced that it had just discovered a mistake of law by the District Court resulting from the application of the 1977 version of the DTPA, rather than the 1973 version of the Act. Long's argument reduces to the assertion that the language in the 1973 Act, proscribing "a failure by any person to comply with an express or implied warranty" is significantly different from the language in the 1977 Act, proscribing "breach of an express or implied warranty." While the DTPA has been amended several times since its original enactment in 1973, our concern is limited to the 1973 version and the 1977 amendments to section 17.50(a)(2). In *Woods v. Littleton*, 554 S.W.2d 662 (Tex.1977), the Texas Supreme Court, in determining whether the DTPA was applicable to certain actions, stated that "we conclude that the date of the acts which give rise to the cause of action under the Consumer Protection Act, rather than the date of the sale, determines the applicability of the Act." 554 S.W.2d at 666. Since the combine was purchased in November 1974 and the breach of warranty and misleading and deceptive practices alleged by Mercer occurred prior to 1977, we agree with Long that the 1973 version of the DTPA would govern.

Long contends that the District Court erred in awarding treble damages under the DTPA based on its determination that a breach of warranty was a per se violation of the Act.[19] The crux of Long's argument is that a "failure to comply" is not equivalent to a "breach" and in 1974 a "breach" was

50% or lower or peanuts will not combine without a heavy loss of peanuts remaining in the hay which goes out the back of the machine. At the end of the row, we start to turn to go on to the next row and if we stop the machine, hay will clog up in the back of the hay dump. If we shut the machine off, trash falls down onto the peanuts and when the machine is started, it blows trash into the peanut dump causing excess foreign material as determined by the government inspector at the time of sale. If you turn with the machine running, the P.T.O. shaft vibrates and breaks the P.T.O. seal in the tractor causing oil loss and down time.

As you are turning the main drive chain breaks causing the same damage as above described.

During breakdown of the machine, peanuts will continue to dry in good weather and will start to shatter off at the pick-up reel and this is more prevalent with the Super II combine as its pick-up teeth flop around back and forth. The vine beater has to be installed per Long instructions and this causes further shattering and loss of peanuts out of the front of the Super II combine.

You have approximately six hours in the afternoon to combine so if the machine is down and you have rain for two or three days, the peanuts will begin to mold and will have to be sold as Section III as required by the United States Government which results in a lower price per ton. Then you have to turn peanuts over or reshake them to let them dry again before you can combine them. During the reshaking or raking operation, you lose an excessive amount of fully matured peanuts causing grade to drop and further loss of money. Four hours of down time can mean a loss of four or five days before the machine can start back to work due to weather conditions.

During rainy weather due to the down time of the Super II combine, leafspot increases causing peanuts to come off the vine. Also, peanuts begin to sprout and will cause heavy damage to grade of peanuts as determined by the United States Government inspector.

**19.** The District Court's order overruling Long's motion for j.n.o.v. stated:

It is the opinion of the Court that there was credible evidence presented to support the jury's finding for the plaintiff on the breach of warranty claim. As a breach of warranty is a per se violation of the Texas Deceptive Trade Practices—Consumer Protection Act, § 17.50, *Texas Business and Commerce Code*, the damages awarded are to be trebled. *Woods v. Littleton*, 554 S.W.2d 662 (1977).

not a per se violation of the Act. Long asserts that a *failure to comply* inherently requires willfulness or scienter as opposed to a *breach of warranty* which may be innocent. Under Long's interpretation, to recover treble damages under the 1973 Act the buyer must first meet the requirements of section 2.607 of the U.C.C.[20] That section provides that a buyer must notify a seller of a breach of warranty and provide the seller with an opportunity to cure any breach. Long relies on *Import Motors, Inc. v. Matthews*, 557 S.W.2d 807 (Tex.Civ.App.—Austin 1977, writ ref'd n.r.e.), for the proposition that a breach of warranty alone is not sufficient for imposition of treble damages under the DTPA. In that case, however, the Austin Court of Civil Appeals specifically stated that the seller had not been notified of the breach of warranty. Here there is no question that Long was aware of Mercer's claims of the breach of the warranty of merchantability.[21]

■ Nor can we agree with Long that the language in the 1973 Act is significantly different from that in the 1977 amendment. While the Texas courts have not specifically addressed the substantive effect of the linguistic change in these two versions of the DTPA, the term "breach of warranty" is used frequently in referring to the nature of a cause of action under the DTPA *prior* to the 1977 amendments. *See, i. e., Flintkote Supply Co. v. Thompson*, 607 S.W.2d

41, 44 (Tex.Civ.App.—Beaumont 1980, no writ); *Boman v. Woodmansee*, 554 S.W.2d 33, 34 (Tex.Civ.App.—Austin 1977, no writ). Legal scholars have indicated that the DTPA under Section 17.50(a)(2) was designed to expand the remedies available to a consumer for breach of warranty under the U.C.C. *See* Anderson, *The Uniform Commercial Code and the Deceptive Trade Practices Act*, 7 St. Mary's L.J. 725, 728, 729 (1976); Bragg, *Now We're All Consumers! The 1975 Amendments to the Consumer Protection Act*, 28 Baylor L.Rev. 1, 14, 15 (1976); Comment, *Caveat Vendor: The Texas Deceptive Trade Practices and Consumer Protection Act*, 25 Baylor L.Rev. 425, 435, 450 (1973). *See generally* Comment, *Breach of Warranty and Treble Damages Under the Texas Deceptive Trade Practices and Consumer Protection Act*, 28 Baylor L.Rev. 395 (1976).

Commentary subsequent to the 1977 amendments indicates that the change of language was designed to conform with that used in the U.C.C. *See* Lynn, *Anatomy of a Deceptive Trade Practices Case*, 31 Sw.L.J. 867, 867 n.8 (1977). The 1977 amendments also added a section providing a defense to treble damages, allowing the imposition of actual damages only where the defendant was not given notice of the consumer's complaint or the opportunity to cure any defects.[22] Long asserts that the

---

**20.** Where a tender has been accepted the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of the breach or be barred from any remedy.

Tex.Bus. & Com. Code Ann. § 2.607 (Tex. U.C.C.) (Vernon 1968).

**21.** One example of this notice comes from Long's answers to interrogatories where it listed the dates of field service reports made on Mercer's machine, showing four separate occasions, beginning in April 1975 and continuing to December 1975. Had Long seriously believed that no notice and opportunity to cure had been given, it could have easily requested the District Court to instruct the jury of the need for notice or have requested an interrogatory on the issue of notice. F.R.Civ.P. 49(a) specifically states that when any issue is omitted from submission to the jury because a party has failed to demand such submission, the court is deemed to have made a finding in

accord with the judgment on the special verdict.

**22.** Sec. 17.50A. Damages: Defenses

In an action brought under Section 17.50 of this subchapter, actual damages only and attorney's fees reasonable in relation to the amount of work expended and court costs may be awarded where the defendant:

(1) proves that the action complained of resulted from a bona fide error notwithstanding the use of reasonable procedures adopted to avoid the error; or

(2) proves that he had no written notice of the consumer's complaint before suit was filed, or that within 30 days after he was given written notice he tendered to the consumer (a) the cash value of the consideration received from the consumer or the cash value of the benefit promised, whichever is greater, and (b) the expenses, including attorney's fees, if any, reasonably incurred by the con-

change in language along with the addition of § 17.50A are indicative of the Texas Legislature's desire not to impose treble damages for an innocent breach of warranty. We cannot accept this interpretation for a pre-1977 case since the modification could just as easily reflect the legislative awareness that § 17.50(a)(2) did not require intent and a subsequent desire to require this additional element. The 1973 Act specifically defines "knowingly" (Section 17.-45(9)) and the term is used in certain sections of the Act. *See Smith v. Baldwin*, 611 S.W.2d 611 (Tex.1980) (construing § 17.-46(b)(7)). "When the Legislature has carefully employed a term in one section of a statute, and has excluded it in another, it should not be implied where excluded." *Smith*, 611 S.W.2d at 616 (citations omitted).

Long initially argued that the DTPA was unconstitutional unless proof of scienter was necessary to establish a claim for treble damages. Long subsequently abandoned this contention because of its argument that Section 17.50(a)(2) as in effect in 1973, proscribed a "failure to comply" which it equates with a willful action and thus one implicitly requiring scienter. Since we do not accept Long's interpretation of the 1973 Act, we address the constitutionality of this section as in effect in 1973. The basis of Long's constitutional attack is Article 1, Section 13 of the Texas Constitution which prohibits excessive fines and the Fourteenth Amendment to the U.S. Constitution prohibiting deprivation of property without due process of law. Long argues that if the 1973 Act is interpreted so that an innocent breach of warranty constitutes a violation requiring the automatic imposition of treble damages, this penalty is so excessive that it "shocks the sense of mankind." Long also argues that Section 17.50(a)(2) is unclear to the extent that it provides insufficient notice. The Texas Supreme Court considered the constitutionality of treble damages under the DTPA in connection with Section 17.46(b), concerning misrepresentations as to condition of a product. In *Pennington v. Singleton*, 606 S.W.2d 682 (Tex.1980), the court addressed both the issue of vagueness and lack of fair notice where a statute is penal in nature and the due process limitations of the Texas Constitution concerning excessive fines.

While this Court is not bound by Texas courts' determinations as to the validity of a state statute under the United States Constitution, *Winters v. New York*, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1947), we agree and accept what has been said by the Texas Supreme Court. The term "failure to comply" with a warranty is not so vague or indefinite as to violate due process, especially where a failure to comply with a warranty has an established meaning in reference to the U.C.C. As to the issue of excessive fines, *Singleton* clearly answered this issue by focusing on the purpose of the DTPA's treble damage provision to encourage private litigation and deter violations. The Act itself provides in Section 17.44 that it "shall be liberally construed and applied to promote its underlying purposes which are to protect consumers against false, misleading and deceptive business practices, unconscionable acts, and breaches of warranty and to provide efficient and economical procedures to secure such protection." Interestingly, this Section (17.44) of the 1973 Act referred to "breaches of warranty" rather than "failure to comply." In *Indust-Ri-Chem Laboratory, Inc. v. Par-Pak Co.*, 602 S.W.2d 282 (Tex.Civ.App.—Dallas 1980, no writ), the court addressed the identical contentions as those of *Singleton* but within the context of Section 17.50(a)(2). "We hold that Section 17.50(a)(2) requires no intent to deceive and that, as so construed, it does not violate the due process clauses of the United States and Texas Constitutions." 602 S.W.2d at 295.

sumer in asserting his claim against the defendant; or

   (3) in the case of a suit under Section 17.-50(a)(2), the defendant proves that he was not given a reasonable opportunity to cure the defects or malfunctions before suit was filed.

1977 Tex.Gen.Laws, ch. 216, § 6, at 604.

74

We find Long's arguments as to vagueness and excessive fines without merit. It is too late in the day to challenge a state regulation, one which is rationally related to a legitimate function of the state. Clearly, the imposition of treble damages is rationally related to the DTPA's announced purpose of deterring violations and providing "efficient and economical procedures to secure [consumer] protections."

REVERSED AND REMANDED.